Merrimack
No. 96-763

# THE STATE OF NEW HAMPSHIRE

v.

## ROBERT BLAIR

June 29, 1999

*Philip T. McLaughlin*, attorney general (*John C. Kissinger*, assistant attorney general, on the brief and orally), for the State.

*Donald E. Bisson*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

THAYER, J. The defendant appeals two first degree murder convictions, RSA 630:1-a (1996), after a jury trial in Superior Court (*McGuire*, J). We affirm.

The defendant testified to the following. In August 1994, the defendant and his family were on vacation in Concord. While in his motel room, the defendant decided to return there one day with his wife and son and kill them.

On March 11, 1996, the defendant, his wife, and his son returned to Concord. They rented the same room at the motel as the defendant had planned. On the afternoon of March 24, the defendant left the motel room and walked to a local store to purchase a hammer. After returning, he hid the hammer under his bed. He testified that he was certain no one would discover the hammer because he "knew it was going to be used before the maids ever c[a]me in the room again."

That evening, the defendant told his wife that he was thinking about killing their son. In fact, he showed his wife the hammer that he intended to use. The defendant testified that his wife became angry. The defendant assured his wife that he would not kill their son, and was confident she believed him. The defendant left the room, threw the hammer outside in the trash, and returned to the motel room. Then he and his family fell asleep.

According to the defendant, during his sleep he experienced a trance "where God revealed to [him] that [he] would be cast into the lake of fire if [he] backed . . . away from it." He further testified that he "heard . . . the voice of [an] angel commanding [him]."

While his wife and son slept, the defendant awoke and left the room to retrieve the hammer from the trash. He returned to the room and bludgeoned his sleeping wife and son. Both died as a result.

Shortly thereafter, the defendant left the motel and went to a nearby store where he asked to speak to the manager. When the manager appeared, the defendant confessed to the killings. The manager called the police. When the police arrived, the defendant told them that he killed his wife and son with a hammer, whereupon he was arrested and charged with two counts of first degree murder. He filed an insanity defense and waived the guilt phase of his trial.

At the beginning of jury selection, the judge instructed the jury that "this is not a capital murder case. That is, the defendant cannot receive the death penalty." The judge explained that "given the charges in this case, it would be natural for [jurors] to wonder about [the death penalty]." According to the judge, "it's only fair to the jurors to inform them that they will not have to be making such decisions in this case." The judge further advised the jury that it is not their job to be concerned with the sentence that the defendant receives because "[t]he duty of determining and imposing sentence is for the judge and not for the jury."

During trial, the defendant testified in his own defense. The defendant testified that "in my opinion, I'm sane. I acted under the command of God. I do not suffer delusions or hallucinations . . . . I

was very rational . . . I understood what I did." The jury found the defendant sane and thereby guilty on both counts of first degree murder. The defendant was sentenced to two consecutive life sentences without eligibility for parole.

On appeal three issues are preserved for our review. *See Daboul v. Town of Hampton*, 124 N.H. 307, 309, 471 A.2d 1148, 1149 (1983) (issues not briefed are waived). First, whether the trial court erred by advising the jury at the outset of trial that it would not be deciding a death penalty case. Second, whether the trial judge erroneously limited the defendant's closing argument. Third, whether the trial court erred in instructing the jury that the defendant bore the burden of proving insanity by clear and convincing evidence. We address each issue in turn.

The defendant argues that the trial court erred when it informed the venire panel at the outset that the defendant was not subject to the death penalty. He contends that such comment minimized the impact a guilty verdict would have. As a result, the defendant argues, the judge's comment created a "preponderantly prejudicial" effect.

█ The general rule is that the jury should not be informed of the penalty that a defendant may receive if convicted, when, as here, the jury will play no role in sentencing. *See State v. Brown*, 132 N.H. 520, 526, 567 A.2d 544, 547 (1989); *Shannon v. United States*, 512 U.S. 573, 579 (1994). The prohibition on discussing penalties applies equally to defense counsel, *see Brown*, 132 N.H. at 526, 567 A.2d at 547, and to the prosecution, *see State v. Beede*, 128 N.H. 713, 715-16, 519 A.2d 260, 262 (1986). We see no reason why this rule should not extend to the trial judge. "When an improper comment or other trial error does bring the extent of a potential criminal penalty to a jury's attention," and where the comment did not result from willful misconduct, a mistrial is warranted only if the improper statement is "both preponderantly and irremediably prejudicial." *Id.* (quotation omitted). Here, the defendant does not assert that the comment resulted from willful misconduct. We hold that the court's statement in this case was not preponderantly and irremediably prejudicial.

Any prejudice created by the trial court's comment was cured by the trial court's instructions to the jury to not concern itself with the defendant's punishment and to follow the court's instruction. "The court's instruction, when read as a whole, unquestionably instructed the jury as to its duty and province." *United States v. Steel*, 759 F.2d 706, 711 (9th Cir. 1985). Between the time of the court's comment and the beginning of deliberations, the selected

jurors were admonished several times not to consider the potential penalty in their deliberation process, including prior to opening statement and several times during the court's final charge. Any potential harm that could have arisen from the court's comment was cured by the judge's instructions, which the jurors can be presumed to have followed. *See Shannon*, 512 U.S. at 585; *State v. Novosel*, 120 N.H. 176, 186, 412 A.2d 739, 746 (1980).

■ · In addition, the defendant himself commented on his potential sentence during cross-examination. Specifically, the defendant stated that "[a]s I explained to this jury, the alternative in this case, to sanity, if you do see me as insane, is not a question of will I be locked up. It will be a question of where I'm locked up. I'll be locked up the rest of my life . . . . " This statement impermissibly allowed the jury to hear the defendant's possible punishment and could have prejudiced the State. *See Brown*, 132 N.H. at 526, 567 A.2d at 547. Moreover, the defendant misstated the law because a finding of insanity would not necessarily lead to a lifetime of confinement. *See* RSA 651:8-b, :9-a (1996). We therefore conclude, under the facts of this case, that the defendant failed to show that the trial court's reference was both preponderantly and irremediably prejudicial. *Cf. Brown*, 132 N.H. at 526, 567 A.2d at 547; *accord, e.g., Fero v. Kerby*, 39 F.3d 1462, 1481-82 (10th Cir. 1994), *cert. denied*, 512 U.S. 1122 (1995); *Steel*, 759 F.2d at 711; *State v. Hernandez*, 846 P.2d 312, 328 (N.M. 1993).

■ The defendant argues that the court's error of commenting that the case did not involve the death penalty was compounded when it informed the jury prior to deliberations of the possible consequence of a not guilty by reason of insanity verdict. We disagree. We have previously stated that a jury charged with ascertaining a defendant's sanity should be instructed about consequences of a "not guilty by reason of insanity" verdict because such consequences are not commonly known. *See Novosel v. Helgemoe*, 118 N.H. 115, 125, 384 A.2d 124, 130 (1978).

The defendant argues in his brief that the court's error was further complicated by the prosecution and the defense references to the possible result of a verdict. This argument, however, was not raised in the defendant's notice of appeal and is not preserved for our review. *See Daboul*, 124 N.H. at 309, 471 A.2d at 1149.

The defendant next argues that the trial court unduly restricted his closing argument. Specifically, he argues that he was erroneously prevented from discussing his dangerousness and the result of an adverse verdict in his closing argument.

■ The proper standard for reviewing a court's restriction of closing argument is abuse of discretion. *Cf. Herring v. New York*, 422 U.S. 853, 862 (1975). The court granted the State's motion *in limine* to preclude the defendant from discussing his dangerousness and punishment during closing because neither sentencing nor a determination of the defendant's dangerousness following a not guilty by reason of insanity verdict were within the province of the jury. Although the defendant attempts to tie the restrictions on closing argument to the court's jury instruction that this is not a capital case, he points to no place in the record where, in objecting to the limitation placed on closing argument, he referred to the court's earlier comment, nor did he suggest that the comment somehow heightened the need for counsel's proposed closing argument. Moreover, the defendant himself testified during cross-examination that he would be confined for life. We, therefore, conclude that the trial court did not abuse its discretion.

We now turn to the defendant's final claim that by requiring him to prove insanity by clear and convincing evidence, the trial court violated his rights under Part I, Article 15 of the New Hampshire Constitution. He urges us to adopt a preponderance of the evidence standard. We decline to do so.

RSA 628:2, II (1996) provides that "[t]he defendant shall have the burden of proving the defense of insanity by *clear and convincing* evidence." (Emphasis added.) We previously held that placing the burden on the defendant to prove insanity does not violate Part I, Article 15 of the New Hampshire Constitution. *Helgemoe*, 118 N.H. at 127, 384 A.2d at 131. We reasoned that "[s]anity should be in the nature of a policy presumption because it is inherent in human nature and is the natural and normal condition of mankind." *Id.* (quotation omitted).

Since the *Helgemoe* decision, and prior to 1987, defendants were only required to prove insanity by a preponderance of the evidence. *See, e.g., State v. Rullo*, 120 N.H. 149, 151, 412 A.2d 1009, 1011 (1980). In 1987, however, the legislature raised the requisite quantum of proof to the level of "clear and convincing evidence." Laws 1987, 13:1 (currently codified at RSA 628:2, II).

In *Helgemoe* we held that insanity constitutes an affirmative defense that must be proven by the defendant. In reaching that holding, we expressly overruled prior case law characterizing sanity as an element of a crime to be proven by the State beyond a reasonable doubt, and instead adopted a presumption of sanity as a matter of public policy. *Helgemoe*, 118 N.H. at 127, 384 A.2d at 131.

■ The United States Supreme Court has held that a state statute requiring the defendant to prove insanity beyond a reasonable doubt does not violate the due process clause of the Federal Constitution. *Leland v. Oregon*, 343 U.S. 790, 798 (1952); *Patterson v. New York*, 432 U.S. 197, 204-07 (1977). We conclude that requiring the defendant to prove insanity by clear and convincing evidence does not violate Part I, Article 15 of the New Hampshire Constitution.

*Affirmed.*

All concurred.